**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**CHRISTOPHER CARR**,

                    Plaintiff,

vs.                                       Hon.
                                        Case No.

**METROPOLITAN LIFE INSURANCE**
**COMPANY**,
a New York company.

                    Defendant.

_____/

**COMPLAINT**

      Plaintiff, CHRISTOPHER CARR, through his attorneys, ILANA S. WILENKIN and

FELDHEIM & WILENKIN, P.C., complains against the above-named Defendant as follows:

### I.    Jurisdiction and Venue

      1)     This Court's jurisdiction exists under the Employee Retirement Income

Security Act of 1974 ("ERISA"), specifically, 29 U.S.C. §§ 1132(e)(1) and 1132(f), which

provisions grant this Court the jurisdiction to hear civil actions to recover benefits due

under the terms of an employee welfare benefit plan.

      2)     The subject welfare benefit plan consists of a long-term disability

insurance plan and life insurance plan, which, upon information and belief, is sponsored

by Barnes Group, Inc. and underwritten and administered by Defendant Metropolitan

Life Insurance Company ("MetLife") for the benefit of Barnes Group, Inc. employees.

      3)     29 U.S.C. § 1133 provides a mechanism for the administrative or internal

appeal of benefit denials.  Plaintiff ("Mr. Carr") has either exhausted all of his appeals or

has been denied access to a meaningful and/or full and fair pre-suit appellate review. This matter is ripe for juridical review.

4)      Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, venue is proper in the Eastern District of Michigan.

## II.      Nature of Action

5)      This is a claim seeking disability income benefits pursuant to a long-term disability income benefit plan, which is sponsored by Barnes Group, Inc. and underwritten and administered by MetLife.  The Barnes Group, Inc. Disability Plan ("the Plan") was intended to provide long-term disability income benefits to Barnes Group, Inc. employees, including Mr. Carr.  If applicable, Mr. Carr also seeks ongoing life insurance coverage pursuant to a waiver of premium due to disability.  This action is brought pursuant to § 502(a)(1)(B) of ERISA - 29 U.S.C. § 1132(a)(1)(B).

## III.      The Parties

6)      Mr. Carr is 46 years-of-age.  He was, and continues to remain, a resident of Ferndale, Michigan.

7)      MetLife is a foreign insurance company doing business within Michigan and has designated The Corporation Company, 40600 Ann Arbor Rd., E., Suite 201, Plymouth, MI 48170-4675, 734-983-9042, to act as its resident agent for service of process.

8)      During all relevant times, the Plan and life insurance plan constituted an "employee welfare benefit plan," as defined by 29 U.S.C. § 1002(1), and, incidental to his employment, Mr. Carr received coverage under the Plan as a "participant," as

defined by 29 U.S.C. § 1002(7).  This claim relates to benefits due under the above-described Plan.

### IV.    Factual Statement/Medical Information

9)    Mr. Carr began working for Barnes Group, Inc. on or about September 7, 2003 as a Corporate Account Manager.

10)    Mr. Carr is 46 years-of-age and was diagnosed with Stage IVB classical nodular sclerosing Hodgkin lymphoma during early 2008.

11)    Mr. Carr was forced to stop working on or about April 16, 2008 due to his cancer diagnosis, treatment, symptoms, and resulting functional impairment.

12)    As an insured employee under the Plan, shortly after his last day of work, Mr. Carr applied to MetLife to begin receiving disability benefits.  Mr. Carr received short-term disability from approximately April 24, 2008 through August 17, 2008[1]. MetLife began paying Mr. Carr long-term disability benefits on or about August 18, 2008.  The Social Security Administration determined that Mr. Carr became disabled under its rules on April 16, 2008 and has been paying benefits since approximately October 1, 2008 without issue.  Mr. Carr has not engaged in any substantial, gainful activity since his last day of work.

13)    Due to the extensive and ongoing nature of Mr. Carr's medical treatment, only the salient points will be addressed herein in order to provide a frame of reference.

---

[1] Counsel does not know whether MetLife paid Mr. Carr's short-term disability benefits.

During June 2008, Mr. Carr's imaging studies demonstrated disease recurrence/progression shortly after completing his last cycle of ABVD. Mr. Carr's then-oncologist noted the following regarding possible treatment:

> We talked about possible intensification of high-dose therapy by enrolling into the SWOG 0410 protocol where patients undergo double autologous transplantation. First procedure is performed with intermediate dose melphalan at 140 mg/m 2 and second transplant involves high-dose cyclophosphamide/etoposide and TBI conditioning. Idea of this trial is built upon preliminary results of European trial suggesting improved outcome. I told Christopher that I think it is quite reasonable to consider enrollment in that protocol once he is ready to be transferred to Transplant Service.
>
> After long discussion and multiple questions from Chris and his wife, the treatment strategy that was constructed for Christopher was enrollment into PSOC 2302 protocol with vorinostat plus ICE for 2 cycles, followed by stem cell product collection followed by enrollment into the SWOG 0410 protocol with double autologous transplantation procedure. (Claim File, p. 44)

14)    Mr. Carr participated in all treatment recommended by his then-oncologist, Andrei R. Shustov, M.D. and has appropriately and consistently treated with medical providers as directed.

15)    Once Mr. Carr moved back to Michigan from Seattle, Washington, he began treating with Karmanos Cancer Center/Institute, specifically David Debono, M.D. (hematology/oncology/pain management) and Radhakrishnan Ramchandren, M.D. (hematology/oncology).

16)    On June 3, 2016, Lisa Fletcher, RN, on Dr. Ramchandren's behalf, responded to MetLife's question by indicating that Mr. Carr was unable to perform sedentary or light-duty work. (Ex. 1)

17)    On June 14, 2016, MetLife's medical director, Puja Kornbathina, M.D.,

opined that:

> Yes. It is reasonable to consider no work in any capacity for this
> claimant from 6/14/16 thru 12/14/16.  **This restriction is based
> on the claimant's extensive history and treatment of HL with
> multiple chemotherapeutic agents, history of osteomyelitis in
> 2015, evidence of bony disease at the thoracolumbar sites,
> recent completion of chemotherapy with side effect of
> autoimmune hepatitis, and maintenance on high dose narcotic
> therapy**.  As per the 4/13/16 note by Dr. Debono, return to work
> was discussed; however, the claimant just achieved complete
> remission and is currently increasing his activities of daily living.
> After 12/14/16. return to sedentary work capacity may be
> reasonable to consider and updated medical information will be
> necessary for review.
>
> **Addendum to Claim 12-6-16**
> Updated medical received indicates that EE has failed urine drug
> screens w/presence of cocaine and unprescribed hydrocodone, as
> well as Adderall.
>
> EE reported increased pain in hands and back after manually
> sanding a floor.  Also the 8/24/2016 medical indicates that EE
> went on a 3 week camping trip to the Western states.
>
> Exam findings are normal.
>
> EE has been referred to psych to manage substance abuse.
>
> **Does the medical reviewed continue to support an impairment
> preventing EE from performing a sedentary demand job?**
>
> No.  The additional medical information in the file does not
> support restrictions/limitations from a physical standpoint
> that would preclude him from working in a sedentary capacity
> as of 12/6/16. (Ex. 2) (Emphasis added and in original)

18)    During a June 30, 2016 office visit, Dr. Debono summarized Mr. Carr's

history and then-current status as follows:

1.      History of group B Streptococcal osteomyelitis/diskitis at L2-L3 (recognized in late June 2015)

2.      Status post 6 weeks of IV antibiotics for osteomyelitis/diskitis (completion in mid August 2015)

3.      History of nivolumab induced autoimmune hepatitis (responsive to prednisone and discontinuing o! the nivolumab)

4.      History of multiple relapses of Hodgkin lymphoma (most recently treated with nivolumab on study with apparent complete remission)

5.      Prior history of autologous stem cell transplant for Hodgkin lymphoma

6.      Chronic pain syndrome

CURRENT MEDICATIONS:

1.      MS Contin 30 mg p.o. every 8 hours
2.      Oxycodone 15 mg p.o. every 4 hours p.r.n. breakthrough pain

Christopher returns for a follow up. He is a 45-year-old gentleman with a history of multiple relapsed Hodgkin lymphoma. Most recently in late 2014, he was treated with nivolumab on study. This was complicated by autoimmune hepatitis and possible autoimmune arthritis involving the right shoulder. This drug was ultimately stopped and he was treated with steroids, and his symptoms improved. He has since been evaluated both by lumbar biopsy as well as PET scan and he is felt to be in complete remission.

In the spring of 2015, he presented with severe pain involving the right shoulder and sternoclavicular region, and aspiration of the sternoclavicular joint was negative for infection. He did have a Hickman catheter cuff removed and his right shoulder discomfort seemed to improve. However, he continued to have low back pain and ultimately required a lumbar spine biopsy, which was negative for Hodgkin lymphoma. That was in the spring of 2015. This pain, however, persisted and a repeat MRI suggested diskitis in June 2015. **A repeat lumbar biopsies/cultures were positive**

6

**for group B Streptococcus and he was treated with IV antibiotics until mid August of 2015.**

In the midst of his infection, his MS Contin escalated to a dose of 200 mg twice a day. However, more recently, his MS Contin had tapered down to 60 mg twice a day. At our last visit, in early May. we went ahead and decreased further to 30 mg every 8 hours. We also began a taper on his oxycodone at his last visit, and it had been decreased to 15 mg.

At our last visit, the patient did have a urine drug screen and he was to return in 4 weeks to review that urine drug screen with us. He failed to make an appointment. However, at that appointment, we did give him prescriptions both for the month of May and the month of June. However, at the beginning of this week, Christopher has been contacting me, complaining of severe pain and being out of medication. He reported a new needle-like sensation in his fingers and his hand, which was causing him a great deal of discomfort and preventing him from sleeping. We went ahead and created an appointment for him today to review his situation, review his drug screen, and make some decisions about future management.

*       *       *

IMPRESSION:

1.      Chronic pain syndrome

2.      Recent worsening of neuropathic pain involving hands and feet (prior therapy with Neurontin and Lyrica was unsuccessful a few years ago)

3.      Urine drug screen positive for cocaine, levamisole, and hydrocodone

4.      History of relapsed Hodgkin lymphoma, currently in remission

PLAN:

The situation has been reviewed with Christopher over the course of an hour today. We explained that we are deeply troubled by his urine drug screen, having both non-prescribed hydrocodone as

7

well as cocaine. I have explained that cocaine is often cut with other chemicals and in his case it was cut with levamisole. Levamisole has been associated with severe problems, such as fascial necrosis. More importantly, in this situation, where Chris has illicit drug use, unprescribed opioid use, and now "running out of his medicines early," are all signs of a substance use disorder. I have explained that this is not a judgment on his character, but simply all of these things put together reflects an underlying disorder that need to be addressed.

Though one might consider an inpatient stay, **my sense is that his situation is "not out of control enough"** and that likely he would not be accepted into an inpatient program and just as importantly I suspect Chris would not agree to "an inpatient program. I would favor the patient being seen by Dr. Ellenberg, who participates in a multi-disciplinary approach to pain as well as addiction. In the meantime, I have suggested we try methadone as a maintenance regimen for him. The patient is completely and adamantly opposed to this as he knows that methadone has not been effective for him in the past. We note that we have had him on methadone in the past.

As a sign of compromise, we will go ahead and prescribe him the MS Contin and the oxycodone. We will decrease the oxycodone from 15 mg to 10 mg. We will give him 1 week supply and we will see him on a weekly basis over the next 3 weeks. (Claim File, pp. 482-485)

19) On January 16, 2017, MetLife denied Mr. Carr's claim based upon the following rationale:

Based on the review of your information that has been received, there is a paucity of information to support ongoing disability or functional impairment precluding you from performing work based on your employer's Long Term Disability Plan. Therefore, you no longer meet the definition of disability from either your own occupation, or any occupation as of January 14, 2017. Under the terms of Barnes Group Inc., your Long Term Disability benefits will terminate January 13, 2017, and benefits have been paid through that date. (Ex. 3)

20)     On June 12, 2017, on Mr. Carr's behalf, Wayne State University Law School's Legal Advocacy Clinic for People with Cancer appealed MetLife's denial, which included updated medical information, including Dr. Debono's May 10, 2017 report explaining the reasons why Mr. Carr is, and shall likely remain, disabled from performing any employment:

There are a number of issues I would like to address.

1)      The question of the presence of a substance use disorder: On May 12, 2016 we sent a urine drug screen randomly.  This returned positive for cocaine and hydrocodone (unprescribed).  I was concerned about a substance use disorder.  I ordered a series of weekly drug screens and these were negative for cocaine or unprescribed opioids. I referred him to psychiatry who saw him in September.  **The patient never fulfilled the criteria of a substance use disorder and this diagnosis was not continued on his problem list.  We do not believe he carries the diagnosis of a substance use disorder.**

2)      The possibility of relapse of his Hodgkin Lymphoma: We are certainly pleased that since stopping Nivolumab in January 2015 that he has had no relapse of his disease.  This is the longest remission that he has had since his diagnosis in 2007.  Nevertheless, the risk of relapse is very real. He is in uncharted waters as the experience to date with Nivolumab in relapsed and refractory Hodgkin Lymphoma is limited.  Longer follow up will be required to ascertain if his remission will be long lasting.  **For now, he remains at a very high risk of relapse of his disease.**

3)      His cognitive abilities: Chris has had extensive chemotherapy and has had total body irradiation. It is **definitely** possible (and **probable**) that **he has sustained some cognitive changes as a result of**

9

**his therapies**. The addition of AddreraII has improved his ability to stay on task and get things done. Nevertheless, Chris does seem to have a gap in his cognitive abilities at this time making it difficult for him to return to a demanding job like his previous job.

4)    His physical limitations: Chris continues to have chronic back pain related to his infection. It Is hoped that this will eventually resolve. For now, we have initiated outpatient rehabilitation in hopes of improving his physical abilities. Based on the severity of his back pain, it does not appear that Chris can return to a similar position as he had before his illness that was physically demanding.

5)    Long-term psychological functioning: Chris has been through 10 years of cancer therapy now. He has suffered long-term sequelae of his disease and treatment. He has recently initiated outpatient counselling to evaluate him and treat him for his unspecified anxiety and mood disorder.

**Based on the above findings, I think it would be very difficult for Chris to return to full-time work: particularly a job similar to his previous position**. (Ex. 4) (Emphasis added)

21)    As part of MetLife's administrative appeal review, it enlisted the services of Avrom Simon, M.D. (Board Certified in Occupational and Environmental Medicine, NOT HEMATOLOGY/ONCOLOGY) to review Mr. Carr's file and offer an opinion regarding Mr. Carr's perceived ability to perform full-time employment. Dr. Simon spoke with Dr. Debono but dismissed his opinions before concluding that Mr. Carr is able to return to full-time sedentary employment based upon a lack of objective medical evidence. (Ex. 5)

22)    On September 15, 2017, MetLife upheld its adverse decision. (Ex. 6)

23)    MetLife's actions have now foreclosed all avenues of administrative appeal and this matter is ripe for judicial review.

24)    Because valid, objective, and well-supported proofs establish Mr. Carr's continuing disability within the Plan's terms, Mr. Carr is entitled to the restoration of long-term disability benefits retroactive to the date they were wrongfully denied (January 14, 2017).    Additionally, and only if applicable, Mr. Carr is entitled to restoration of his life insurance coverage under a waiver of premium.

**WHEREFORE**, based upon the preceding reasons, Plaintiff prays for the following relief:

A)    That this Court enter judgment in Mr. Carr's favor against MetLife and order the immediate payment of Mr. Carr's disability income and other employee benefits, including group life insurance policy, retroactive to the date that benefits were denied;

B)    that this Court order MetLife to pay Mr. Carr post-judgment interest on all accrued benefits in accordance with M.C.L. § 600.6013 and 600.6455;

C)    that this Court order MetLife to continue paying Mr. Carr's benefits, provided that he continues to meet the Pla'n' terms and conditions for the receipt of benefits;

D)    that this Court award attorneys' fees pursuant to 29 U.S.C. § 1132(g); and

E)    that Mr. Carr recover all relief to which he may be entitled, along with the costs of litigation.

Respectfully submitted:

**FELDHEIM & WILENKIN, P.C.**

By:    s/Ilana S. Wilenkin
       Ilana S. Wilenkin (P61710)
       Plaintiff's attorney
       30300 Northwestern Highway, Suite 108
       Farmington Hills, MI 48334-3255
       (248) 932-3505; Fax (248) 932-1734
       ilana@lawsmf.com

Date:  December 20, 2017