# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Christopher Carr,

                Plaintiff,        Case No. 17-cv-14101

v.                            Judith E. Levy
                                 United States District Judge

Metropolitan Life Insurance
Company,                      Mag. Judge R. Steven Whalen

                Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [19] AND DENYING DEFENDANT'S MOTION TO AFFIRM THE ADMINISTRATOR'S DECISION [23]

Plaintiff Christopher Carr brought this action against defendant Metropolitan Life Insurance Company under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), challenging defendant's termination of his long-term disability ("LTD") benefits. Plaintiff seeks judgment on the administrative record and argues that defendant's termination of his LTD benefits was arbitrary and capricious. (Dkt. 19.) Defendant seeks judgment affirming the termination decision. (Dkt. 23.)

# I.    Background

Plaintiff began working for Barnes Group, Inc. in 2003 as a corporate account manager. (Dkt. 19 at 6.) He became insured under the ERISA-governed Barnes Employee Benefit Plan (the "Plan") in about October of 2004. (*Id*.; *see also* Dkt. 23-2.) Defendant is the Plan's administrator and underwriter. (Dkts. 19 and 23-2.)

The Plan defines "disabled" as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1.    during your Elimination Period [180 days of continuous disability] and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation[1] for any employer in your Local Economy, or

2.    after the first 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation ["Any Occupation"] for which you are reasonably

---

[1] The Plan defines "Own Occupation" as "the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your employer. It maybe a similar activity that could be performed with our Employer or any other employer." (Dkt. 23-2 at 20.) The term "Local Economy" under the plan means, in relevant part, "the geographic area surrounding your place of residence, which offers reasonable employment opportunities." (*Id*.)

qualified taking into account training, education, experience and Predisability Earnings.

(Dkt. 23-2 at 19.) The Plan further states: "Monthly Benefits will end . . . on (3) the date you are no longer Disabled." (*Id.* at 18.) It also states that it is the employee's burden to prove his disability: "You will be required to provide . . . any other items we may reasonably require in support of your Disability. These will include but are not limited to: . . . Proof of continuing Disability." (*Id.* at 31.)

Finally, the Plan vests discretion in defendant's administrator to determine benefit eligibility: "the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to LTD benefits in accordance with the terms of the Plan." (*Id.* at 43.)

### a. Plaintiff's Cancer Diagnosis, Treatment, and Initial LTD Benefits

In 2007, plaintiff was diagnosed with Hodgkin's lymphoma. (Dkt. 19 at 7–8.) Plaintiff underwent extensive treatment, spanning nearly a decade. His treatment included chemotherapy in 2007, after which he suffered a relapse in January 2008. (*Id.*) On April 16, 2008, plaintiff stopped working due to his cancer, extensive treatment, and treatment-

related side effects (*id*. at 6) and was approved for Social Security Disability Income on August 19, 2008.[2] (*Id*. at 29.) On October 14, 2018, defendant determined that plaintiff satisfied the preceding disability threshold for his Own Occupation, and began paying him LTD benefits under the Plan.  (*Id*. at 29.)

After plaintiff began receiving Own Occupation LTD benefits, he continued receiving multiple treatments for cancer, including a stem cell transplant. (Dkt. 19 at 8). Plaintiff achieved complete remission in February 2009, but relapsed a few months later in June. (*Id*.) Plaintiff began treatment for resistant Hodgkin's lymphoma with Dr. Radhakrishnan Ramchandren. (*Id*.) During treatment, he was also diagnosed with Guillan-Barre Syndrome, which was treated with IV therapy. (*Id*. at 10.)

On October 14, 2010, plaintiff's Own Occupation LTD benefits under the Plan ended, and defendant approved plaintiff for Any Occupation LTD benefits. (*Id*.) After being approved for Any Occupation

---

[2] Social Security benefit eligibility decisions are governed by different standards than defendant's determination of eligibility for LTD benefits under the Plan. However, since defendant admits that it considered plaintiff's Social Security benefit award in its eligibility decision, this fact is noted here. (Dkt. 23 at 30)

LTD benefits, plaintiff continued receiving cancer treatments including 34 cycles of a new therapy between May 2011 and November 2013, and he participated in a clinical trial of a new chemotherapy drug. During that clinical trial in December 2014, he was diagnosed with autoimmune hepatitis. (Dkt. 23-5 at 2.) His doctors discontinued chemotherapy and treated plaintiff with steroids. (Dkt. 19 at 11.) Plaintiff continued to experience side effects from the steroids months later, in May 2015. (*Id*.)

### b. Chronic Back Pain, Neuropathy, and Emotional Effects

Throughout these treatments, and as early as 2006, plaintiff complained of continuing chronic back pain and was prescribed morphine and oxycodone for pain. (*Id*.; *see also* Dkt. 11-4 at 55.) He also reported fatigue, anxiety, and depression due to coping with cancer. (Dkts. 19 at 11 and 11-4 at 55.) Plaintiff first began treatment with his palliative care doctor, Dr. David Debono, beginning in June 2015. Dr. Debono suspected his back pain could be related to previous tumors and also related to joint inflammation and destruction. (Dkt. 19 at 16.) At that time, Dr. Ramchandren, plaintiff's oncologist, indicated that plaintiff was not likely to improve further and was permanently disabled. (Dkt. 10-7 at 82.)

Plaintiff was also diagnosed with a spinal infection in June 2015. (Dkt. 19 at 17.) He was admitted to the hospital for almost a week and was treated with IV antibiotics. (*Id.*) After his discharge, he continued a six-week IV antibiotic treatment. (*Id.*)

Plaintiff also reported neuropathy from his chemotherapy. (*Id.*) In November 2015, plaintiff travelled to his rental property in Florida, and spent time "fixing it up."[3] (*Id.*) After this trip, plaintiff reported worsening shoulder and collar bone pain, as well as neuropathy. (*Id.* at 18–19.)

A December 2015 scan showed no evidence of a residual or recurrent tumor. (*Id.* at 19.) His palliative care doctor, Dr. Debono, encouraged plaintiff to reduce his oxycodone, but plaintiff continued to run out of his tapered-medications early and reported continued pain. (*Id.*) In February and March 2016, plaintiff travelled to Florida. He continued to report back pain and he also continued to run out of his pain medications early. (*Id.* at 20.) In April 2016, plaintiff reported he was doing some minimal work for a friend who started a small company. (*Id.*

---

[3] It is not clear from the records what "fixing it up" entails, whether this encompasses light housekeeping or more laborious tasks.

at 21.) He expressed that he was thinking of returning to work and expressed a need for mental healthcare. (*Id.*)

Plaintiff also visited Dr. Mary Morraele, a psychiatrist, throughout 2015 and 2016. He sought help for anxiety and depression related to his long-term cancer treatment. (Dkt. 19 at 16, 18, 27.) In October 2016, plaintiff reported to Dr. Morraele that, despite improvement in his cancer diagnosis, he was sometimes unable to do anything and stayed in bed. (Dkt. 10-2 at 33–35.)

### c. Surveillance

Around April 2016, defendant hired an outside vendor to surveil plaintiff and investigate his social media accounts. The surveillance showed that plaintiff ran an errand in his car to an ACE Hardware and another unknown store, and then returned home. (*Id.* at 30–31.) He also was seen using his phone, texting or emailing. (*Id.* at 31.) The surveillance on his social media showed "little useful information." (*Id.*)

In June 2016, Dr. Ramchandren again opined that plaintiff was unable to return to work, due to terminal lymphoma and neuropathy. (*Id.*) Plaintiff reported that his neuropathic pain increased when he attempted manual labor at his house, including floor sanding. (*Id.* at 23.)

On June 30, 2016, plaintiff's urine screen tested positive for cocaine, levamisole, and hydrocodone. (*Id*.) His doctors, including his palliative care doctor, Dr. Debono, expressed concern that this screen result was a sign of substance abuse. (*Id*.) Dr. Debono determined that inpatient substance abuse care was not necessary, however, and increased the frequency of plaintiff's appointments for closer monitoring. (*Id*. at 23–24.) Dr. Debono also prescribed Adderall, which helped plaintiff focus and motivated him to accomplish home-related tasks. (*Id*. at 24.)

### d. June 2016 Review and Recommendation of Continued LTD Benefits

On June 14, 2016, defendant's Medical Director, Dr. Puja Korbathnia, reviewed plaintiff's file through May 2016 (the "June 2016 Review"). (Dkt. 23-5 at 2–3.) The June 2016 Review considered only plaintiff's physical impairments. (*Id*. at 2.) The June 2016 Review also considered plaintiff's long medical history with Hodgkin's lymphoma, numerous cancer treatments, and chronic back pain. (*Id*.) It also considered plaintiff's improvements. For example, the June 2016 Review mentions plaintiff's reported "clinical improvement and reduced pain" in September 2015, as well as a "normal" physical exam. (*Id*.) It reflects consideration of plaintiff's statement in April 2016 about a "potential

return to work," and his "increased activity and administrative work." (*Id.*) It further notes that his May 2016 physical exam was "unremarkable" and his CT Scan at the same time was "stable." (*Id.*) The report states that plaintiff "is in a good place and [doctors] will monitor him closely off treatment." (*Id.* at 3.) Furthermore, based on its timing, the June 2016 Review would have considered plaintiff's documented travel to Florida, work on his rental property, tasks including floor sanding, doing minimal work for his friend's small company, defendant's outside vendor's surveillance results, and plaintiff's positive drug tests for unprescribed medications.

After considering both plaintiff's ongoing physical symptoms and his improvements and/or stability in certain areas, Dr. Korbathnia concluded: "It is reasonable to consider no work in any capacity for this claimant from 6/14/16 thru 12/4/16." (*Id.*) Thus, plaintiff's LTD benefits remained intact.

### e. December 2016 Review and Recommendation of Discontinued LTD Benefits

In December 2016, defendant asked its medical director, Dr. Korbathnia, to conduct another review of plaintiffs' medical records (the "December 2016 Review"). This review considered additional treatment

records between June 2016 and December 2016, key details of which are outlined as follows:

- In August 2016, plaintiff went on a three-week camping trip in the western United States. (*Id.* at 25.) Plaintiff reported that he was tapering his pain medications, but also reported an increase in back pain upon his return (*Id.*).

- Plaintiff's August 26, 2016 drug screen tested positive for amphetamines, marijuana, and opiates.

- By October 2016, plaintiff was receiving mental health treatment, attending physical and occupational therapy, and exercising regularly at a local gym. (*Id.* at 27.) He reported that he found it hard to accept that he was in remission and make future plans. (*Id.*)

- In November 2016, Dr. Debono noted that plaintiff appeared to have chemotherapy-induced cognitive changes that responded to Adderall. (Dkt. 19 at 27.) Plaintiff had recently done well during an extended trip to Florida. (*Id.*) He also continued efforts to decrease his pain medication. (*Id.* at 27 – 28.)

Dr. Korbathnia's December 2016 Review of this information resulted in the following opinion:

*Addendum to Claim 12-6-16*

Updated medical received indicates that [plaintiff] has failed urine drug screens w/ presence of cocaine and unprescribed hydrocodone, as well as Adderall.

[Plaintiff] reported increased pain in hands and back after manually sanding a floor. Also the 8/24/2016 medical indicates that [plaintiff] went on a 3 week camping trip to the Western states.

Exam findings are normal.

[Plaintiff] has been referred to psych to manage substance abuse.

*Does the medical review continue to support an impairment preventing EE from performing a sedentary demand job?*

No. The additional medical information in the file does not support restrictions/limitations from a physical standpoint that would preclude him from working in a sedentary capacity as of 12/6/16.

(Dkt. 24-3 at 2 (emphasis in original).)

Based on Dr. Korbathnia's December 2016 Review, on January 16, 2017, defendant notified plaintiff that he was no longer eligible to receive LTD benefits under either his Own Occupation or Any Occupation under the Plan (the "January 2017 Denial"). (Dkt. 24-6 at 2–6.) Specifically, defendant denied plaintiff's eligibility to receive LTD benefits due to "a paucity of information to support ongoing disability or functional impairment precluding you from performing work based on your employer's Long Term Disability Plan." (*Id.*)

### f.  Plaintiff's Appeal

In June 2017, plaintiff appealed defendant's January 2017 Denial through defendant's administrative appeals process. His appeal included updated medical evidence, as well as a report by his palliative care doctor, Dr. Debono. (Dkt. 19 at 33.) Dr. Debono's report indicated that plaintiff's symptoms did not fulfill the criteria fpr substance abuse disorder. He also stated that plaintiff's risk of cancer relapse is "very real," "very high risk," and that plaintiff was in "uncharted waters."  (*Id*. at 33–34.) Dr. Debono indicated that plaintiff likely has sustained cognitive changes as a result of his chemotherapy, as well as severe back pain. (*Id*. at 34.) He concluded that, after ten years of cancer therapy, "it would be very difficult for Chris to return to full-time work[;] particularly a job similar to his previous position." (*Id*.)

Defendant sent plaintiff's medical records to two physicians for an Independent Physician Consultation review, which only included reviewing files; they did not examine plaintiff. Then, based largely on its physician-consultant's opinions, defendant upheld its denial of plaintiff's LTD benefits on September 15, 2017 (the "September 2017 Appeal").

## II.    Legal Standard

Where, as here, the Plan grants the plan administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," courts "review the administrator's denial of benefits under the arbitrary-and-capricious standard." *Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 546 (6th Cir. 2015) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "Under the arbitrary-and-capricious standard, we must uphold the plan administrator's decision if it is 'the result of a deliberate, principled reasoning process' and 'supported by substantial evidence.'" *Id.* at 547 (quoting *DeLisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009)). Plaintiff ultimately bears the burden of proof in showing that the decision to terminate LTD benefits was arbitrary and capricious. *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).

The Court's review, though deferential, "is not a rubber stamp. [It] must still evaluate the quality and quantity of the medical opinions on both sides." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 302 (6th Cir. 2009);

*see also Cannon v. PNC Fin. Servs. Group & Affiliates Long Term Disability Plan*, 645 F. 344, 346 (6th Cir. 2016).

The inquiry that guides federal court review of "an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). The Court can consider several factors known as the "*Shaw* factors," in determining whether the decision is arbitrary and capricious, for example, "the quality and quantity of the medical evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw*, 795 F.3d at 547.

## III.  Analysis

Plaintiff argues that defendant's denial of his LTD benefits was arbitrary and capricious for four reasons. First, plaintiff argues that defendant ignored favorable evidence submitted by his treating

physicians and selectively reviewed the evidence it did consider. Next, plaintiff argues that defendant improperly relied on its physician consultants', who made improper credibility determinations based on a file-only review. Third, plaintiff argues that defendant improperly relied on a mischaracterization of its surveillance. Finally, plaintiff argues that defendant had an inherent conflict of interest as plan administrator and funder. For the reasons set forth below defendant's ultimate decision to deny plaintiff's LTD benefits was arbitrary and capricious.

## A. Defendant Ignored and Selectively Reviewed Evidence Submitted by Plaintiff's Treating Physicians

First, plaintiff argues that defendant's decision to deny his LTD benefits was arbitrary and capricious because defendant ignored favorable evidence submitted by his doctors and selectively reviewed the evidence it did consider. "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). However, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*. at 834. Nor can administrators "engage [] in a selective review of the administrative record to justify a decision to terminate coverage." *Metro. Life Ins. Co. v.*

*Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (internal quotation marks omitted).

In *Shaw*, the Sixth Circuit reversed the undersigned and overturned the defendant plan administrator's denial of LTD benefits in part due to the administrator ignoring favorable evidence from the plaintiff's treating physician and selectively reviewing the remainder of evidence it did consider. 795 F.3d at 548. The *Shaw* defendant stated there were "no specific measurements[,] no specific physical examination[, and] no new neurological testing and motor strength testing" to support the plaintiff's claim of chronic neck pain. *Id*. However, the plaintiff's medical records showed measurements, physical examination notes, and testing consistent with the plaintiff's claim. *Id*. Instead of offering or evaluating the plaintiff's contradictory evidence, the administrator ignored the plaintiff's documented medical records and objective evidence. *Id*. Moreover, the defendant's physicians failed to make a reasonable effort to speak with the plaintiff's physicians. *Id*.

Similarly here, defendant summarily ignored and selectively reviewed many of plaintiff's physician's treatment notes and opinions. Defendant's January 2017 Denial relies heavily on its medical director,

Dr. Korbathnia's, December 2016 Review. The December 2016 Review ignores plaintiff's records of many medical visits, including to plaintiff's oncologist, Dr. Ramchandren, on June 29, 2016. In that visit, Dr. Ramchandren documented plaintiff's continued need for pain medications and his chronic back pain. (Dkt. 23-6.) The Denial also does not address plaintiff's visits to Dr. Debono on multiple occasions, including: (1) June 30, 2016, documenting chronic pain syndrome and worsening neuropathy (Dkt. 23-7); (2) July 7, 2016 documenting plaintiff's severe shoulder and low back pain (Dkt. 23-8); (3) July 13, 2016 documenting plaintiff's chronic pain syndrome, history of depression, anxiety and recent difficulty with unprescribed medications (Dkt. 23-8); (4) July 28, 2016 documenting plaintiff's pain management for chronic severe shoulder and back pain (Dkt. 23-9 at 2–5); (5) September 14, 2016 documenting chronic pain syndrome, and worsening neck and back pain (Dkt. 23-9 at 6); or (6) October 5, 2016 documenting Dr. Debono's concern that plaintiff was coping primarily with medications but continued to have pain control issues, soreness, and throbbing in his hands (Dkt. 23-11). It also does not address his visits to Dr. Morraele on September 14, 2016, and October 6, 2016, where he reported increased anxiety since

going into remission, and his inability to leave his bed on some days. (Dkt. 23-10 at 3; *see also* Dkt. 10-2 at 33–35.)

The January 2017 Denial concludes that plaintiff's claim file information contains "numerous inconsistencies," and finds that these inconsistencies and lack of information support denial of benefits. (*Id.*) The discernable inconsistency, however, is Dr. Korbathnia's change of heart between June 2016 and December 2016 without a reasoned analysis. For example, defendant's January 2017 Denial quotes nearly directly from Dr. Korbathnia's June 2016 Review, which resulted in defendant keeping plaintiff's LTD benefits intact. Dr. Korbathnia's June 2016 Review states: "His neuropathy is stable, he denies fevers, night sweats, abdominal pain . . . Claimant he [sic] is in a good place and will monitor him closely off treatment." (Dkt. 23-5 at 2–3.) The January 2017 LTD benefit denial states: "Your neuropathy is stable, you denied fevers, night sweats, abdominal pain [. . .] Your healthcare provider does not recommend any treatment and noted you are in a good place and will monitor you closely off treatment." (Dkt. 24-6 at 4.) That defendant would parrot language from the June 2016 Review recommending a

continuation of LTD benefits as a reason for denying the same six months later is not explained.

Additionally, the January 2017 Denial cites to plaintiff's desire to wean down on his narcotic therapy, failed drug screen with the presence of cocaine and then-unprescribed Adderall and hydrocodone as reasons for denying plaintiff's LTD benefits. (Dkt. 24-6 at 4.) Defendant cites to plaintiff manually sanding a floor (after which he reported increased neuropathic pain, which defendant does not address). (*Id.*) In the September 2017 Appeal, defendant cites to plaintiff travelling to Florida where he owns a condo, a new relationship with a girlfriend, working out at a gym, and the three-week camping trip.[4] (Dkt. 24-11.)

There is nothing about a failed drug screen, increasing pain after attempting to undertake physical labor, a new girlfriend, and taking a

---

[4] Defendant and its reviewing physicians put much emphasis on the three-week camping trip, as though it undoubtedly proves that plaintiff was no longer disabled at that time. Defendant ignores that plaintiff's own doctor, Dr. Debono, stated in the records after the camping trip: "He did reasonably well, but he did develop some neck pain and there were times in which his back pain was somewhat worse." (Dkt. 23-9 at 6.) Dr. Debono's post-camping assessment is consistent with plaintiff's reported condition at the time of his June 2016 Review when he was known to have engaged in a certain level of activity such as travel from Michigan to Florida. The Florida travel, however, did not result in denial of plaintiff's LTD benefits in June 2016.

camping trip with reported pain afterwards that inherently contradict plaintiff's previous and then-ongoing reports of disabling pain. If anything, these activities evidence that plaintiff had a desire to return to a more active lifestyle, but his consistently-documented physical limitations continued to hold him back. In other words, the activities plaintiff undertook, and resulting pain plaintiff reported, between June 2016 and December 2016, were not qualitatively different from the pre-June 2016 activities when plaintiff qualified for LTD benefits.

Moreover, although not required under the Plan, neither Dr. Korbathnia nor defendant document any efforts made to talk directly to any of plaintiff's treating physicians before issuing the January 2017 Denial. (*Id. see also* Dkt. 23-5 at 2-3; Dkt. 24-3 at 2.)

In sum, defendant's selective review ignores much documented medical evidence that plaintiff continued to suffer from chronic back pain, neuropathy, and the cognitive effects of cancer treatment. He received regular, continuing treatment from his doctors for these conditions during this period, and they thoroughly documented their treatment. Defendant's selective review of only certain evidence, while ignoring other evidence favorable to plaintiff, is a factor that weighs in

favor of finding that defendant acted arbitrarily and capriciously in denying plaintiff's LTD benefits.

## B. Defendant's Physicians Conducted a File-Only Review

Next plaintiff argues that defendant's reliance on its own physician consultants is arbitrary and capricious because the consultants conducted a file-only review. As set forth above, defendant's January 2017 Denial, as part of the administrative appeal process, defendant selected Dr. Avron Simon, a Board Certified Occupational and Environmental Medicine doctor, to review plaintiff's claim file. He concluded that plaintiff could perform work on a full-time basis. (Dkt. 23 at 25.) Defendant also provided plaintiff's file to Dr. Marcus Goldman, an Independent Physician Consultant, Board Certified in Psychiatry, who reached the same conclusion. (Dkt. 23 at 27.) Defendant heavily relied on both physicians' file reviews in its September 2017 Appeal.

The decision to have a consulting physician conduct a file-only review rather than a physical examination can, under certain circumstances, be a factor to consider in the overall assessment of whether the administrator acted arbitrarily and capriciously in denying

LTD benefits.[5] *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Those circumstances include where, as here, the right to conduct a physical examination "is specifically reserved in the plan— [which] may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* A file-only review may also be a factor to consider whether a denial is arbitrary and capricious "where the file reviewer concludes that the claimant is not credible without having actually examined him or her." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013). Each Plan physician-consultant, Dr. Simon and Dr. Goldman, did precisely this, which is a *Shaw* factor in favor of finding that defendant acted arbitrarily and capriciously in relying upon their opinions.

## 1. Dr. Avron Simon

Dr. Simon, defendant's first physician-consultant, made improper credibility determinations in his review. For example, plaintiff alleges

---

[5] A consulting physician's file-only review is not improper in itself. There is nothing in the Plan that bars a file-only review by a physician instead of a physical examination. Notably, however, the Plan specifically reserves the right to allow defendant to conduct a physical examination ("[w]e will have the right to have you examined at reasonable intervals by medical specialists of our choice. The examination will be at our expense…") (Dkt. 23-2 at 33.)

that he suffers from cognitive issues secondary to many years of chemotherapy and cancer treatments. Dr. Simon disagrees, however, stating that because plaintiff has not "demonstrated any sort of cognitive impairment." (*Id*.) He also states, "[t]he patient has no restrictions on activities such as being in the house, driving, access to noxious materials (fire, chemicals, knives, etc.) in any setting." (Dkt. 24-8 at 7.) It is unclear why Dr. Simon uses this standard in determining whether plaintiff has any cognitive limitations, when that is not the standard plaintiff is required to meet under the Plan, except that Dr. Simon is challenging plaintiff's veracity in reporting cognitive issues and pain.

Next, Dr. Simon dismisses plaintiff's abundantly-documented peripheral neuropathy, stating that the absence of electrodiagnostic testing results indicate that plaintiff's neuropathy after many years of cancer treatment are merely "anecdotal in nature." (*Id*.) Again, it is unclear why plaintiff would be required to undergo electrodiagnostic testing to confirm plaintiff's veracity regarding neuropathic pain when his own doctors never doubted that plaintiff suffered from neuropathy after almost a decade of chemotherapy treatments, including a bone marrow transplant. Chemotherapy drugs are a well-known cause

peripheral neuropathy.[6] After all of plaintiff's documented chemotherapy treatments, his own doctors do not reflect disbelief that he suffered from neuropathy.

Dr. Simon also reached a credibility determination regarding plaintiff's back pain. Dr. Simon dismisses plaintiff's back pain mostly because there are multiple possible causes, as though this decreases the likelihood of its existence, stating that plaintiff's back pain is "at times attributed to cancer, then degenerative spinal changes (07/28/10 MRI of LS spine noted degenerative changes) and later, sequalae from osteomyelitis and L2-3 infection." (Dkt. 24-8 at 7.) Dr. Simon assessed plaintiff's credibility when he dismissed plaintiff's back pain simply because it originates from multiple, or even unknown, causes. Dr. Simon even cited plaintiff's failed drug screen, but Dr. Simon does not explain how a failed drug test shows plaintiff was not in back pain or that he was less than veracious. (Dkt. 24-8 at 7.) If anything, it seems to suggest that plaintiff had substantial back pain, shoring up his credibility.

---

[6] *See* Long-term organ damage from chemotherapy, 2 Attorneys Medical Deskbook § 24:12.10 (West 2019).

Interestingly, defendant argues that Dr. Simon's conclusion regarding plaintiff's pain and cognitive issues comports with the conclusions of plaintiff's own doctors. However, defendant—and indeed Dr. Simon—would have to ignore the vast majority of plaintiff's medical records to believe that plaintiff's own doctors agree with defendant. But since Dr. Simon states in his report that he reviewed plaintiff's entire file, but concludes that plaintiff does not suffer from neuropathy, cognitive deficits, or chronic back pain, the conclusion drawn is that Dr. Simon does not believe plaintiff is telling the truth.

Dr. Simon also assessed plaintiff's credibility when he was dismissive of plaintiff's treating physician's opinions during follow-up telephone calls to plaintiff's doctors.[7] For example, he asked plaintiff's oncologist Dr. Ramchandaren's nurse "to expound on how these issues would impede the patient from performing sedentary type work, *noting that the records in this chart indicate that the patient has been performing at least at sedentary physical demand for the last months if not years.*"

---

[7] Defendant's physician-consultants' telephone conversations with plaintiff's providers do not change the file-only nature of review. Rather, Dr. Simon's failure to conduct a physical examination of plaintiff, particularly when the Plan expressly reserved the right to do so, is the *Shaw* factor that weighs against defendant in finding that its denial of LTD benefits was arbitrary and capricious.

(Dkt. 24-8 at 5 (emphasis added).) This line of questioning demonstrates that Dr. Simon had made up his mind regarding whether plaintiff was truthful when he said he was in pain and demonstrates that Dr. Simon even second-guessed defendant's June 2016 finding that plaintiff qualified for LTD benefits.

There is nothing in plaintiff's medical records that indicates his treating physicians doubted plaintiff's veracity regarding his reports of back pain, neuropathy, or his physical and mental conditions. Plaintiff had an established medical history that warranted continued medication to control his pain. In September 2016, at the time of Dr. Simon's review, plaintiff remained on MS Contin at 30 mg every twelve hours, and oxycodone 10 mg every four hours. He remained on Klonopin for anxiety and Adderall for focus and motivation. (*Id*.) Dr. Simon simply did not credit plaintiff's reports to his own doctors of pain, neuropathy, and cognitive issues, who themselves felt no need to have plaintiff's veracity tested in the manner Dr. Simon believed was appropriate.[8]

---

[8] Notably, Dr. Simon's file-only reviews have been questioned in other cases in this Circuit where a benefits administrator's determination to deny benefits has been overturned as arbitrary and capricious. Dr. Simon's record of giving "only the most superficial consideration to [plaintiff's] actual abilities and job requirements" and reviewing information in a "selective fashion" is concerning, particularly where, as

In sum, Dr. Simon's file-only review made improper credibility determinations and discounted the opinions of plaintiff's long-term treating physicians and specialists. Thus, defendant's reliance on Dr. Simon's file-only review in denying plaintiff's LTD benefits is a factor that weighs against defendant.

## 2. Dr. Marcus Goldman

Plaintiff also argues that defendant's physician-consultant psychiatrist Dr. Goldman's file-only review was improper. First, it is arbitrary to have a psychiatrist review for a serious mental disorder when plaintiff is not claiming one. Rather, plaintiff alleged, among other deficits, cognitive disfunction as well as depression and anxiety secondary to his cancer diagnosis and years of cancer treatment. (Dkt. 19 at 62.)

---

here, it appears the pattern continues. *See Phelps v. Siemens Long-Term Disability Plan*, No. 04-068, 2007 U.S. Dist. LEXIS 70714 at *52 (S.D. Ohio, September 24, 2007); *and see Zuke v. American Airlines, Inc.*, 644 F. App'x 649, 654 (6th Cir. 2016) (finding that the plan "ignored key pieces of evidence" and made "factually incorrect assertions," when the plan administrator relied on Dr. Simon's opinions that there was "nothing . . . objectively abnormal" and "no documentation of any restrictions.") Dr. Simon's track record, though certainly not a deciding factor, is noteworthy where the question is whether defendant engaged in a "deliberate, principled reasoning process," required by *Shaw. See Shaw*, 795 F. 3d at 551.

File-only reviews are particularly questionable methods for psychiatric opinions. "[F]ile reviews are questionable as a basis for identifying whether an individual is disabled by mental illness." *Jarvey v. Lucent Techs. Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 702 (6th Cir. 2014). This is because, unlike other medical professionals, "the psychiatrist typically treats his patient's subjective symptoms." *Smith v. Bayer Corp. Long Term Disability Plan, Nos. 06-6468*, 275 F. App'x 495, 508 (6th Cir. 2008).

Dr. Goldman, in concluding that plaintiff does not have a supported psychiatric limitation stated that, in his opinion,

> Clinical findings do not include impaired debilitating anxiety, intoxication, active suicidal or homicidal thinking, disorganization, gross inattention or distractibility or gross behavioral abnormalities. Further the documentation does not adequately support that the claimant has problems with I/ADLS due to a mental disorder. Information does not adequately support evidence of impairment due to medications associated with treatment of the reported mental condition, such as overt cognitive dulling, sedation or confusion. The documentation does not provide sufficient evidence that this claimant is incapable of performing activities requiring attention and focus, meeting deadlines, managing time or controlling emotions, interacting appropriately with others, making decisions or thinking clearly and rationally.

(Dkt. 24-9 at 4.) It is unclear why Dr. Goldman applied this standard for a cognitive impairment, as it goes well beyond that required by the Plan itself.

Here, plaintiff's own medical practitioners report that "the side effects from his opioids [are] somewhat debilitating." (Dkt. 23-8 at 6.) Further, plaintiff's medical notes state that: "[t]hough he denies major depressive symptoms, he did have 1 day this past week in which he slept at 3 or 4 o'clock and really just 'could not get himself out of bed.'" (*Id.*) Plaintiff reported to Dr. Morraele in September 2016, that he had "more anxiety since he has gone into remission," and that "he also wakes up on occasion crying." (Dkt. 23-10 at 2.) He was assessed as having an "unspecified anxiety disorder" and "unspecified mood disorder," (*id.* at 3), and also PTSD requiring trauma therapy. (Dkt. 24-10 at 6–7.)

Dr. Goldman also remarks on "a marked paucity of relevant information." (Dkt. 24-9 at 4.) Yet, there are, in fact, voluminous records regarding plaintiff's mental state throughout the 2015–2017 time frame not only from mental health professionals, but also plaintiff's cancer, palliative care, and pain management physicians, documenting mental health concerns including, but not limited to, anxiety, depression, lack of

concentration, inability to stay on task, and cognitive changes resulting from his cancer therapies. (Dkt. 24-7 at 8–9; *see also* Dkt. 24-10 at 2–7.) When plaintiff's own treating physicians opined that plaintiff could not return to work given, among other factors, his cognitive state, it simply does not square with Dr. Goldman's opinion, particularly when he never evaluated plaintiff.

In sum, Dr. Goldman's file-only review improperly discounted the opinions of plaintiff's long-term treating physicians and specialists without explanation. His report reflects a selective review and disregard of plaintiff's amply documented issues with anxiety, depression, lack of concentration or ability to stay on task, cancer treatment-related cognitive changes, and use of opioids to control his pain. Thus, defendant's reliance on Dr. Goldman's file-only review in denying plaintiff's LTD benefits is a factor that weighs against defendant.

## C. Surveillance Characterization

Plaintiff next argues that defendant's decision to terminate his LTD benefits was arbitrary and capricious because defendant's characterization of its own surveillance activities was inaccurate.

The video surveillance of plaintiff taken in April 2016—again, before the June 2016 Review and affirmation of continued LTD benefits— showed that plaintiff ran errands in his car and used his phone to text or email. And the surveillance of his social media showed nothing about his capabilities.

However, in its September 2017 Appeal, defendant characterized the surveillance results as "showing Mr. Carr as active and out and about in the community." (Dkt. 24-11 at 5.) This language in the September 2017 Appeal is lifted directly from Dr. Simon's report. (Dkt. 24-8 at 6.) Yet, Dr. Simon's report is devoid of any reference that he personally reviewed the surveillance video. (Dkt. 24-8.) Dr. Simon merely summarizes "the available clinical information" in his report, and states only as follows related to the surveillance: "5/14/16 – Surveillance was conducted on this patient who was seen in his car and at the store." (Dkt. 24-8 at 4.) It is not clear from this alone that Dr. Simon's, and thus defendant's parroted "out and about in the community" characterization is based on Dr. Simon's own viewing of the surveillance video.

Here, as described, the surveillance did not reveal plaintiff engaged in actions outside his claimed limitations.

## D. Inherent Conflict of Interest

Plaintiff argues that defendant's inherent conflict of interest should be weighed as a factor in determining whether defendant's decision to terminate plaintiff's LTD benefits was arbitrary and capricious. For ERISA purposes, "a conflict of interest is present when the same entity both funds the plan and evaluates claims for benefits thereunder." *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 981 (6th Cir. 2010) (citing cases). The root of the conflict is that "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in the employer's pocket." *Id*. (*quoting Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)). In *Glenn*, the Supreme Court held that the conflicted entity need not be an employer, "but could instead be (for example) an insurance company—as long as it was the same entity that performed both the benefits-determination and the benefits-payout functions." *Morris*, 399 F. App'x 982 (characterizing *Glenn*).

A structural conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117. In other words, the mere existence of a structural conflict is not enough

to trigger the Court to factor this in determining whether defendant's denial was arbitrary and capricious. Instead, "Sixth Circuit caselaw requires a plaintiff not only to show the purported existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue." *Hunt v. Metro. Life Ins. Co.*, 587 F. App'x 860, 862 (6th Cir. 2014) (quoting *Cooper v. Life Ins. Co. of North Am.*, 486 F.3d 157, 165 (6th Cir. 2007)).

Plaintiff does not proffer any evidence, much less significant evidence, that defendant's conflict actually affected or motived its decision to deny him LTD benefits. Accordingly, defendant's conflict of interest is not a factor in determining whether defendant acted arbitrarily and capriciously in denying plaintiff's LTD benefits.

*

In sum, defendant's denial of plaintiff's LTD benefits was arbitrary and capricious. First, defendant improperly ignored favorable evidence submitted by plaintiff's treating physicians, and selectively reviewed the evidence it did consider. Next, defendant improperly relied on its physician consultant's opinions which made improper credibility determinations based on a file-only review. Third, defendant's improper

characterization of its surveillance evidence weighs in favor of finding defendant's denial as arbitrary and capricious. Plaintiff has not met his burden that defendant's inherent conflict of interest as plan administrator and funder renders defendant's denial arbitrary and capricious. On the whole however, for the reasons set forth, defendant's denial of LTD benefits was arbitrary and capricious. Accordingly, plaintiff's motion requesting judgment on the administrative record is granted, and defendant's motion to affirm the administrator's decision is denied.

## E. Remedy

When a benefits plan is found to have acted arbitrarily and capriciously, this Court has two options: award LTD benefits to the claimant or remand to the plan administrator. *See Shaw,* 795 F.3d at 551. "[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled, the appropriate remedy generally is to remand to the plan administrator." *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 622 (6th Cir. 2006) (internal quotation marks and brackets omitted). In this

matter, the want of a deliberate, principled reasoning process results in remand to the plan administrator.

Plaintiff also requests attorney fees, an insurance policy with waiver of premium, interest, and costs. (Dkt. 18 at 66.) Plaintiff has not fully briefed these issues, nor has defendant responded to them. Plaintiff may submit a memorandum on these issues on or before two weeks from the date of this Order. Defendant's response and plaintiff's reply, if any, shall be made in accordance with the local rules.

## IV. Conclusion

For the reasons set forth above, the Court GRANTS IN PART plaintiff's motion requesting judgment on the administrative record (Dkt. 19) and DENIES defendant's motion to affirm the administrator's decision. (Dkt. 23.) The case is remanded to the plan administrator to determine plaintiff's LTD benefits as of January 14, 2017.

IT IS SO ORDERED.

Dated: March 20, 2019          s/Judith E. Levy
     Ann Arbor, Michigan          JUDITH E. LEVY
                                 United States District Judge